**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10          SAN JOSE DIVISION
11
12   Nancy Zayed,                           NO. C 04-01787 JW
13          Plaintiff,
14          v.                              **ORDER GRANTING IN PART AND**
                                            **DENYING IN PART APPLE'S MOTION**
15   Apple Computers, a corporation doing    **FOR SUMMARY JUDGMENT**
     business in California; David Black, an
16   individual,
17          Defendants.
18   _____/
19                    I.  INTRODUCTION
20          The instant lawsuit arises out of Plaintiff Nancy Zayed's ("Zayed") former employment with
21   Defendant Apple Computers.  Defendant David Black is Plaintiff's former supervisor.[1]  Zayed
22   essentially contends that she was discriminated against on the basis of her race, national origin,
23   religion, and gender in violation of federal and state law.  Presently before the Court is Apple's
24   motion for summary judgment.  Based upon all papers filed to date, the Court grants in part and
25   denies in part the motion.
26
27   _____
28          [1]  Unless otherwise specified Defendants are collectively referred to as "Apple."

## II.  BACKGROUND

Zayed is an Egyptian Arab Muslim woman.  Apple hired Zayed as an at-will Engineer Scientist II (grade 6) in the Software Operations System ("OS") division in June 1994.  In September  1999, Zayed transferred into the Final Cut Pro ("FCP") department within the Applications Engineering organization at Apple in a grade 7 engineering position, where she was supervised by Mike Mages ("Mages").  Zayed was responsible for migrating FCP technology to the Macintosh OSX platform.  This entailed testing and writing code, which Zayed performed primarily alone.  In December of 2000 Mages promoted Zayed to a grade 8 in recognition of her achieving the milestone of migrating FCP to the OSX platform.

After the migration project, however, Zayed's employment with Apple allegedly dramatically changed.  More specifically, Zayed contends that her work environment at Apple changed significantly following the tragic events of September 11, 2001.[2]  For example, Zayed details an instance where her colleague asked her questions about whether the Quoran really instructed Muslims to participate in suicide bombings.  On another occasion, one of Zayed's colleagues allegedly stared at her, stormed off, and slammed her door, allegedly because of that colleague's opposition to the war in Iraq.  Apple also sent out a group email to the FCP group requesting the citizenship status of each employee to address a copyright issue to which the sender employee had been assigned.  Especially disturbing to Zayed was an incident where an employee placed red, white, and blue ribbons outside every employee's office door as a symbol of unity and patriotism.  Zayed observed that the ribbons had been placed on everyone's door except her own, and interpreted this as an act to exclude her based on race, ethnicity, and religion.

According to Zayed, from the spring of 2002 to September 28, 2004, she was isolated and marginalized within her practice group; she was denied career opportunities to work on critical projects; and she observed junior and less experienced male Caucasian non-Arab colleagues receive

---

[2] Zayed describes several events as indicative to how her work environment changed, but fails to specify when each of these events occurred.  For purposes of this motion, the Court assumes that the events occurred shortly after September 11th.

1  premier assignments and quick promotions.  Apple contends, however, that as Zayed's performance
2  became more visible to management, it became apparent that Zayed was not completing projects as
3  quickly as expected and did not work well under pressure.

4       During the relevant period, Zayed worked on a project called EDL ("Editor Decision List").
5  EDL is a feature in FCP that allows for the assembly and manipulation of movie footage and
6  cinematic effects within specific frames.  According to Zayed, the project was riddled with problems
7  due to the poor quality of the code.  Zayed alleges that throughout the project, she communicated
8  regularly and proactively with Apple's Quality Assurance ("QA") team, and never missed a
9  deadline.  Zayed further alleges that Mages never raised any performance issues with her.

10       In contrast to Zayed's description of the EDL project, Mages observed problems with
11 Zayed's performance from the start.  Mages contends that Zayed's attempts to "fix" problems with
12 the code actually caused additional problems so that the code was worse than it was before  Zayed
13 touched it.  Mages further contends that Zayed failed to communicate regularly and proactively with
14 Apple's QA team.  Mages also observed that Zayed was not well organized and took far longer than
15 other engineers to accomplish her responsibilities.  Mages contends that he communicated his
16 concerns to Zayed repeatedly, but felt Zayed was resistant to hearing any type of negative or
17 constructive feedback.  Zayed contends that eventually, Mages designated a person by the name of
18 Harrison as lead of the project, even though Zayed had requested the lead role.

19       In spring of 2002, Zayed began reporting directly to Defendant David Black ("Black"). By
20 Zayed's description, she became the subject of unfavorable treatment under Black's management that
21 was directed at her personally.  Black allegedly began to observe problems with Zayed's technical
22 skills in late 2002 when Zayed worked on a project involving a videodisc unit feature ("VDU
23 project").  Black contends that even after he explained to Zayed that the entire project depended on
24 her ability to enhance speed and performance, she exhibited an inability to proactively research the
25 underlying technology and innovate solutions for the problems she encountered.  Upon realizing the
26 VDU project would not reach its desired result, Zayed allegedly failed to determine how to improve
27
28

United States District Court
For the Northern District of California

3

United States District Court

For the Northern District of California

the feature and failed to communicate for several weeks that she was unable to improve it.  As a result, Zayed allegedly missed her deadline for the VDU project and Black eventually stepped in, successfully re-writing the code to make the feature run faster.  Zayed alleges she solved problems with the VDU project as they arose, developed the user interface by using existing mechanisms, and followed defined engineering process.  Apple contends that even beyond the VDU project, Zayed consistently failed to complete tasks in a timely and efficient manner, and that the delays in Zayed's work forced other engineers to perform unscheduled work in order to salvage projects.

Black also allegedly received complaints from other engineers about Zayed.  Black observed that Zayed appeared unwilling to acknowledge any problems with her work and reacted angrily and defensively when questioned in peer review meetings.  Beginning in 2003, Black repeatedly received complaints from various employees regarding Zayed.[3]  Specifically, Zayed's colleagues claimed she submitted software claiming it was ready for testing when it was not, and they began to question Zayed's honesty about the status of her work.  Zayed was also allegedly unavailable to respond to these issues and questions about her work.

On August 23, 2003, Zayed sent Black an email entitled "Future Direction" in which she expressed concern about career development and the fact that colleagues were receiving superior work opportunities in no clear pattern, whereas Zayed was receiving tangential assignments and ones related to technologies at the end of their life cycle.  According to Zayed, Black knew that her complaints regarding career development, including the email, consistently related to discrimination and that she was seeking a remedy for the unfair treatment.  Zayed states that Black never responded to this email.

On December 1, 2003, Zayed received a performance evaluation from Black and Zayed's second-level manager Brett Halle ("Halle").  The evaluation rated Zayed's performance as "needs

---

[3]  One of these employees was QA Manager Eric Lin ("Lin").  Zayed's request for an order striking the declaration of Lin (Docket Item No. 42) is denied.  Lin was disclosed as a witness in an interrogatory response as well as during the deposition of Defendant Black.  Zayed's request to strike Apple's submission of an unpublished opinion by Judge Hamilton is granted.  Zayed's and Apple's respective requests for sanctions are denied.

improvement" based on her failure to follow established procedures for the development process; her level of productivity; initiative in resolving development issues; and her failure to assume the responsibility expected of a grade 8 engineer.  Black commented that QA staff had been frustrated with Zayed's lack of honesty and adversarial attitude, and stated that her serious performance issues would need to be addressed for her to continue in her then-current position on the FCP team. However, Zayed describes the performance review as comprised of offensive remarks and judgments which failed to be substantiated by Black.  Zayed claims that Black yelled at her and pounded on the conference table.  Zayed alleges that her evaluation contradicted Apple's policy regarding the review process.

Zayed contested her review to HR Manager Heather Ramirez ("Ramirez"), particularly concerned about the "needs improvement" rating and the comments regarding her lack of honesty. Apple contends that at no time while contesting her review did Zayed mention discrimination. Ramirez, Black, and Zayed met to discuss her concerns on December 8, 2003, but Zayed was allegedly unable to specifically refute any statements made in the review.  Rather, Zayed allegedly agreed she could attain three of the four areas for development contained in the review, as they were part of her normal work responsibilities.  With regard to the fourth goal, Zayed allegedly asked Black how she could enhance her working relationship with QA; Black responded by asking her to work more proactively with QA.  Following this meeting, Black changed the wording in the review by removing the "lack of honesty" language, but the overall rating remained the same.

On December 12, 2003, Zayed sent an email to Black stating that she contested the review. Zayed claimed:

> I am getting this negative and biased review in retaliation for my continued documented requests for getting the same chances afforded to other colleagues (juniors or seniors)...I have not been given my warranted and earned position as well as my merited raises for ethnic, gender, and age reasons.

(Declaration of Jessica Perry in Support of Motion for Summary Judgment ("Perry Decl."), Docket Item No. 33, Exhibit L [December 2003 email].)  Zayed informed Ramirez that she would be taking a medical leave of absence.

**United States District Court**

For the Northern District of California

1    Also on December 12, 2003, Zayed sent an email to Chief Talent Officer Dan Walker

2  ("Walker") conveying the same information as the previous email to Black.  Walker referred the

3  matter to the Employee Relations organization; Apple hired an independent outside consultant,

4  Nancy Dewey ("Dewey") to investigate Zayed's concerns.  Dewey did not begin her investigation

5  until Zayed could participate, which was not until she returned from medical leave.  On December

6  16, 2003, Zayed filed a discrimination complaint with the EEOC, detailing the allegations of

7  retaliation, hostile work environment, and discrimination she suffered under Black's management.

8    Zayed returned to work in March 2004.  Dewey allegedly tried to arrange a meeting with

9  Zayed to investigate her concerns; Zayed refused to attend or provide any additional information,

10  stating that all communications should be directed to her counsel.  However, by Zayed's account, she

11  tried to be accommodating and professional, but Dewed did not include her in the investigation.

12  Zayed allegedly suggested that Dewey provide written requests or questions for her to complete.  It

13  is undisputed that Zayed was never interviewed.  Dewey proceeded with the investigation and

14  concluded that Zayed had not been the subject of discrimination, retaliation, or any other

15  inappropriate conduct.

16    On March 10, 2004, Zayed met with HR Director Judy Goodson ("Goodson").  At this

17  meeting, Zayed allegedly acknowledged that she understood Black's expectations for her and her

18  deadlines.  Zayed claims she told Black that if he wanted to communicate with her, it was to be in

19  writing.  Apple contends Zayed was continually absent following this meeting, missing at least 13

20  full days over the next two months and some partial days as well.  Zayed's absences allegedly

21  resulted in uncompleted assignments which impacted the abilities of other team members to meet

22  their own deadlines.  Zayed admits that she did take several sick days.  However, she contends that

23  Black assigned her an aggressive schedule, that she met all of her project deadlines, and that she

24  provided weekly status reports as requested.

25    On May 25, 2004, Halle informed Zayed that she would be reassigned to a specific unit test

26  development position in FCP.  This position was assigned grade level 7, one grade below Zayed's

27

28                                                        6

previous position.  Apple contends this decision was made based upon the needs of the team and done to place Zayed in a position that better matched her skills and experience.  While the grade level changed, Zayed's compensation, office assignment, and managerial reporting structure were not affected by her reassignment.  Zayed asserts that this reassignment was a demotion in response to her refusal to take a second sick disability leave.  In fact, Zayed asserts that Black pressured her to take sick leave by yelling at her in a demeaning and intimidating manner and pounding his fist on the table.  Black challenged the legitimacy of Zayed's sick days, and allegedly instituted an attendance policy applicable only to her.  Zayed eventually took a second disability leave from June 9, 2004 to September 7, 2004.

Just before Zayed took the second disability leave, Zayed was told that if she did not accept the new position at grade 7 level, Apple would conclude she was resigning.  Zayed refused to accept the position even though she was informed that her salary would not be lowered.  Halle reiterated to Zayed that Apple would conclude she was resigning.  While Zayed was on her disability leave, she was informed by Goodson that her grade 8 position had been eliminated and the grade 7 position had been filled.  Goodson also informed her that she would have three additional weeks to locate another job within Apple once she returned to work.  If she could not locate another position, she would be eligible for severance pay.  According to Zayed, she was effectively prevented from pursuing typical networking efforts to secure a new job.  She was unable to locate another position and her employment was terminated on September 28, 2004.  Zayed rejected the severance offer in favor of filing the current lawsuit.  She currently works as a Senior Software Engineer at another company, earning 20% more than she earned at Apple.

Zayed asserts twelve claims against Apple: (1) race discrimination under 42 U.S.C. § 1981; (2) race discrimination under Title VII; (3) race discrimination under the Fair Employment and Housing Act ("FEHA"); (4) national origin discrimination under FEHA; (5) religious discrimination under FEHA; (6) gender discrimination under FEHA; (7) failure to maintain a harassment-free environment under FEHA; (8) retaliation under FEHA; (9) failure to promote under Title VII and

1  FEHA; (10) slander; (11) libel; and (12) intentional infliction of emotional distress.

2                                   III.  STANDARDS

3         Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

4  admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

5  material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P.

6  56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims

7  or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

8         The moving party "always bears the initial responsibility of informing the district court of the

9  basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

10 interrogatories, and admissions on file, together with the affidavits, if any' which it believes

11 demonstrate the absence of a genuine issue of material fact." Id. at 323.  If this burden is met, the

12 moving party is then entitled to judgment as a matter of law when the non-moving party fails to

13 make a sufficient showing on an essential element with respect to which the non-moving party bears

14 the burden of proof at trial.  Id. at 322-23.

15        The non-moving party "must set forth specific facts showing that there is a genuine issue for

16 trial." FED. R. CIV. P. 56(e).  The non-moving party cannot defeat the moving party's properly

17 supported motion for summary judgment simply by alleging some factual dispute between the

18 parties.  To preclude the entry of summary judgment, the non-moving party must bring forth

19 material facts,  i.e., "facts that might affect the outcome of the suit under the governing law . . .

20 Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby,

21 Inc., 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there

22 is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio,

23 475 U.S. 574, 586 (1986).

24        The court must draw all reasonable inferences in favor of the non-moving party, including

25 questions of credibility and of the weight to be accorded particular evidence.  Masson v. New

26 Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255); Matsushita,

27

28                                           8

United States District Court
For the Northern District of California

475 U.S. at 588; T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence."  T.W. Elec. Serv., 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587.

## IV.  DISCUSSION

A.      Race Discrimination under 42 U.S.C. § 1981, Title VII, and FEHA

Apple addresses Zayed's first three claims for race discrimination collectively.  Apple further addresses race discrimination in two parts: discriminatory failure to promote and discrimination with respect to other aspects of Zayed's employment.  The Court addresses each argument in turn.

### 1.      Prima Facie Case for Discriminatry Failure to Promote

The analysis for a claim of employment discrimination under FEHA parallels that of Title VII.  Levy v. Regents of the Univ. of California, 199 Cal. App. 3d 1334, 1343 (Cal. Ct. App. 1988); see also L.A. County Dept. v. Civil Service Comm'n, 8 Cal. App. 4th 273, 280 (Cal. Ct. App. 1992) (stating that in employment discrimination cases, California courts have frequently adopted the standards used in proving intentional discrimination under Title VII of the Civil Rights Act).  To establish a prima facie case of discrimination, the plaintiff must meet following factors: (1) plaintiff is a member of a protected class, (2) plaintiff applied for, but did not receive, the job or promotion in question, (3) a person of comparable qualifications outside the protected class received the position, and (4) plaintiff was qualified for the position.  Levy, 199 Cal. App. 3d at 1343-1344.

Apple first contends that it is entitled to summary judgment on the racial discrimination claims because Zayed cannot establish her prima facie case to show discriminatory failure to

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  promote.  Specifically, Apple contends that Zayed cannot show she applied for specific promotions

2  nor that she was substantially more qualified for the position sought than the person who received it.

3  ((Defendants' Motion ("Mot."), Docket Item No. 32, at 14:12-26.)

4      Zayed responds by pointing out that the "requisite degree of proof necessary to establish a

5  prima facie case for Title VII...on summary judgment is *minimal* and does not even rise to the level

6  of a preponderance of the evidence."  Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654,

7  659 (9th Cir. 2002) (emphasis added) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.

8  1994)).  Zayed contends that each element necessary to prove discriminatory failure to promote has

9  been satisfied.  With regard to Apple's assertion that she must have applied for specific positions

10  rather than manifested a general interest in being promoted, Zayed claims that she continually

11  applied for positions beginning in 2001.  (Plaintiff's Opposition ("Opp'n"), Docket Item No. 46, at

12  18:9-10.)  Zayed stated in her deposition:

13      Q:   How many engineering manager positions did you actively see in the last two
           years of your employment within Final Cut Pro?
14      A:   I would say three or four.

15  (McCoy Declaration, Docket Item No. 45, Exhibit A [Deposition of Nancy Zayed ("Zayed Dep.")] at

16  294:24-295:2.)  Zayed also testified at her deposition that she applied for two positions outside of

17  FCP, one in the Quick Time Group and another in the I Photo Group.  (Zayed Dep. at 286:21-25 &

18  287:11-13.)  The Court finds these statements in Zayed's deposition are sufficient to establish a

19  prima facie case that she applied for but did not receive promotions at Apple.

20      With regard to the third and fourth elements of Zayed's prima facie case, the Court finds

21  Zayed has raised a triable issue of fact regarding whether the persons promoted over her were more

22  qualified than she.  Zayed claims that a number of non-Arab, non-Muslim, non-Egyptian males with

23  less experience and less seniority in FCP were promoted during the period she sought and applied

24  for promotions.  (Opp'n at 18:15-22.)  Specifically, Zayed names David Black, Mike Marinkovich,

25  Pete Steinheuer, and Gio Angelino as persons promoted as engineering managers in FCP during her

26  tenure.  (Zayed Dep. at 297:9-24.)  Apple points out that Zayed is not aware of the technical or

27

28                                            10

1  management background of any persons promoted and thus has no basis for asserting they were less

2  qualified then her.  (Mot. at 15:4-6.)  However, Zayed does indicate in her deposition that some of

3  the persons promoted during her tenure were hired after her.  (Zayed Dep. at 297:9-17.)  The Court

4  finds that there is a triable issue of fact regarding whether Zayed was more qualified than the

5  promoted colleagues.  Because of her seniority in FCP and past promotions, a reasonable person

6  could find that a discriminatory pattern existed in promoting persons in FCP with less experience

7  than Zayed to managerial positions.

8       2.     Discrimination in Zayed's Employment Aside from Failure to Promote

9       With regard to discrimination in other areas of Zayed's employment, Apple characterizes

10  Zayed's claim as consisting of Black failing to allow her to participate in interviews or customer site

11  visits, assigning her tangential projects, and refusing to interact socially with her.  (Mot. at 16:20-

12  22.)  Apple argues that none of Black's alleged conduct is actionable because it does not constitute

13  substantial or material adverse action taken that affected the terms and conditions of her

14  employment, as required under California law.  (Mot. at 16:23-17:11.)  Zayed responds that she was

15  singled out for different treatment starting in 2001.  Specifically, her supervisors refused to present

16  her with a ten-year anniversary award, as had been given to her male counterparts;

17   that she was excluded from activities and opportunities necessary for advancement that her non-

18  Arab American colleagues participated in.  (Opp'n at 23:9-14.)  More specifically, Zayed claims that

19  she was deprived of: (1) opportunities to visit customer sites, (2) one-on-one support, and (3)

20  mentoring opportunities, including tutoring in code of the FCP application. Zayed claims that

21  developing expertise in this area is precisely what she needed in order to advance to a managerial

22  position.  (Opp'n at 23:19-23.)  Moreover, Zayed claims the differing treatment prevented her from

23  receiving proper feedback on her work, placing her at a disadvantage to others in FCP.  (Opp'n at

24  23:28-24:2.)

25       The Court agrees with Apple that Black's refusal to interact with Zayed socially cannot

26  constitute an adverse employment action with a substantial and material effect.  (See Brooks v. City

27

28                            11

1   of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000) (stating that "[b]ecause an employer cannot force

2   employees to socialize with one another, ostracism suffered at the hands of coworkers cannot

3   constitute an adverse employment action").  Further, the Court finds that the failure of Zayed's

4   supervisors to present her with her ten-year award is not adverse employment action.  Zayed does

5   not point to any evidence in the record proving that this event affected the terms or conditions of her

6   employment.

7        However, the Court does not agree with Apple's assertion that an adverse employment action

8   requires a change in pay, benefits, and level of responsibility (Mot. at 17:2-6), nor that Zayed is

9   required to specifically identify customer site visits or interviews from which she was excluded.

10  With regard to the site visits, Zayed testified in her deposition that she would:

11       ask [Black] to take [her] with him on-site visits so [she] would get an exposure to
         how [their] clients and customers use the application and have a feel for the need and
12       be able to develop better or to suggest features, and [Black] would promise that he
         would take [her], and specifically to Disney and Pixar, but he never did, and he would
13       take Helena [Ju], he would take others.

14  (Zayed Dep. at 91:15-23.)  Zayed further testified that Black would give one-on-one support to other

15  colleagues, such as Helena Ju, multiple times per day to show them "how to get things done."

16  (Zayed Dep. at 91:7-12.)  Zayed alleges that she would request that Black give her the "same kind of

17  help" as he would for her other colleagues, but he would never follow through on his promises to

18  assist her.  (Zayed Dep. at 91:13-15.)  At the same time, Zayed's colleagues would allegedly receive

19  mentoring or training in code of the FCP application.  She testified that as a result of the

20  opportunities, they would "know the different parts, and the different technologies, how...they make

21  changes."  (Zayed Dep. at 80:16-18.)

22       The California Supreme Court has recently stated that "adverse treatment that is reasonably

23  likely to impair a reasonable employee's job performance or prospects for advancement or promotion

24  falls within the reach of the antidiscrimination provisions of [FEHA]."  Graves v. Johnson Control

25  World Services, Inc. 2006 WL 618796 (N.D. Cal. 2006) (quoting Yanowitz v. L'Oreal USA, Inc., 36

26  Cal.4th 1028, 1055 (2005).  Zayed has raised a triable issue of material fact regarding whether

27

28                                                  12

Black's allegedly differential treatment put her at a disadvantaged position in being promoted and constituted an adverse employment action.

With regard to the tangential assignments, Apple argues that Zayed cannot show that she received objectively less favorable assignments than her peers and that particular job assignments have no material or substantial adverse effect on her employment.  (Mot. at 17:15-17.)  On the other hand, Zayed contends that toward the end of her tenure she noticed that younger members of FCP were receiving the types of assignments she had been attempting to get.  (Zayed Dep. at 151:2-13.)  Specifically, they would receive assignments involving new features and the types of assignments that would "give [them] exposure...[and] add to [their] expertise and...knowledge."  (Zayed Dep. at 151:7-10.)  Whether Zayed's treatment may be perceived as amounting to a change in her level of responsibility and whether it constitutes an adverse employment action are issues that should be decided by a jury.  As such, the Court finds that Zayed has established a prima facie case for discriminatory failure to promote.

3.  Establishing Pretext or Discriminatory Intent

Apple argues that even if Zayed could establish a prima facie case for discrimination in failing to be promoted and in other aspects of her employment, she cannot establish that Apple's legitimate reasons for her lack of promotion and treatment are pretextual.  (Mot. at 15:17-24 & 17:27-18:7.)  Apple gives many explanations for Zayed's treatment.  With regard to the failure to promote, Apple contends that despite her failure to actually apply for promotions, Zayed was simply not qualified for management positions because of problems with her technical skills, communication, and teamwork.  (Mot. at 15:24-27.)  In other aspects of Zayed's employment, Black did not invite Zayed on site visits because the customers visited did not have technical issues uniquely related to Zayed's responsibilities.  (Declaration of David Black in Support of Motion for Summary Judgment ("Black Decl."), Docket Item No. 36, ¶ 16.)  Black also contends that he assigned Zayed to projects that he thought matched her technical skills and expertise.  Moreover, Apple argues that Black and Halle, her superiors who gave the negative performance evaluation,

United States District Court

For the Northern District of California

13

United States District Court

For the Northern District of California

1   were not aware of Zayed's race, national origin, or religion prior to the lawsuit.  (Black Decl. ¶ 31;

2   Declaration of Brett Halle in Support of Motion for Summary Judgment ("Halle Decl."), Docket

3   Item No. 35, ¶ 7; Mot. at 16:6-8 & 18:10-11.)

4         In response, Zayed emphasizes that she personally witnessed other engineers causing bug or

5   software errors that resulted in a delayed project schedule.  (Declaration of Nancy Zayed in Support

6   of Opposition to Motion for Summary Judgment ("Zayed Decl."), Docket Item No. 44, ¶¶ 20-21.)

7   While Apple contends that these were problems areas for Zayed, Zayed states that her male,

8   Caucasian, non-Arab engineers causing the same problems were never transferred, demoted, or

9   disciplined as she was.  (Zayed Decl. ¶ 21.)  Furthermore, Zayed contends that none of her projects

10  fell behind schedule due to any bug or software errors attributable to code she authorized.  (Zayed

11  Decl. ¶¶ 15-18, 20.)  Zayed also contends that Apple cannot justify its treatment of her by stating

12  that she finished projects of poor quality because many of the projects assigned to her were filled

13  with bugs and of poor quality at the outset, such that no other person wanted to work on them.

14  (Zayed Dep. at 99:4-6; Opp'n at 20:3-5.)

15        Zayed also disputes Apple's contention that Black and Halle were not aware of her race prior

16  to the filing of this lawsuit.  First, Zayed points out that she was originally recruited as an Arabic

17  localizer at Apple, and that her personnel file would have disclosed this.  (Zayed Dep. at 50:3-9.)

18  Second, she points out that her appearance and name are non-white (Zayed Decl. ¶ 48; Opp'n at

19  21:17-18.)  Third, Zayed stated in her deposition that it was "common knowledge" among her

20  supervisors, including Black, Mages, Harrison, and Halle, that she traveled each year to Egypt to see

21  family.  (Zayed Decl. ¶ 24.)  In one instance, Harrison was instructed by HR to speak to Zayed

22  concerning potential problems that might arise with regard to Zayed's ethnicity shortly after

23  September 11, 2001.  (Zayed Dep. at 37:9-14.)  Harrison also made an international long distance

24  call to Zayed while on one of her annual vacations to Egypt.  (Zayed Decl. ¶ 25.)  The Court finds

25  that Zayed has produced enough evidence from which a jury could find that Apple and Zayed's

26  supervisors knew of her race.

27

28                                              14

United States District Court

For the Northern District of California

In sum, the Court denies Apple's motion for summary judgment with regard to her first three claims alleging racial discrimination.  Zayed has produced sufficient evidence to establish her <u>prima facie</u> case, and raised genuine issues of material fact as to whether Apple's explanations are pretextual.

B.      <u>Discrimination on the Basis of National Origin and Religion under FEHA</u>

Apple's arguments with regard to Zayed's claims of discrimination on the basis of national origin and religion are essentially identical to those made against the racial discrimination claims. For the reasons set forth above in Section A, the Court denies Apple's motion for summary judgment with regard to these claims.

C.      <u>Gender Discrimination under FEHA</u>

With regard to gender discrimination, Apple again repeats its argument made in support of granting summary judgment for race discrimination.  However, Apple also argues that this claim fails because Zayed admitted that Helena Ju, a female colleague, received the developmental opportunities that Zayed alleges she was denied.  (Mot. at 19:23-25.)  Because the alleged lack of developmental opportunities is not the sole basis of Zayed's discrimination claim and for the reasons set forth in Section A, the Court denies Apple's motion for summary judgment with regard to the gender discrimination claim.

D.      <u>Failure to Promote Claim</u>

Apple contends that Zayed's failure to promote claim must fail, as it is duplicative of the discrimination claims.  As stated in Section A, the Court finds that Zayed has established her <u>prima facie</u> case with regard to discriminatory failure to promote.  The Court denies Apple's motion for summary judgment on this claim.

E.      <u>Retaliation</u>

To establish a <u>prima facie</u> case of retaliation under FEHA, the plaintiff must show: (1) he or she engaged in protected activity, (2) the employer subjected the plaintiff to an adverse employment action, and (3) there exists a causal link between the protected activity and the adverse employment

action.  <u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal.4th 1028, 1042 (2005).  Apple contends that Zayed's claim fails because she cannot establish any of the three elements.

According to Apple, the August 2003 email to Black was not a protected activity under Cal. Gov't Code § 12940(f).  (Mot. at 20:20-21.)   In addition, Apple contends the negative performance evaluation and reassignment that occurred after she sent the email do not rise to the level of an adverse employment action that had a substantial and material effect on the terms and conditions of her employment.  With regard to the last element, Apple contends that there is no causal connection because too much time lapsed between both the August and December 2003 emails and the allegedly adverse actions.  (Mot. at 22:22-24.)  Apple also argues that there are legitimate reasons for the changes in her employment after the email, and that Zayed cannot establish pretext and retaliatory motive.  (Mot. at 23:18-19.)

Zayed responds by pointing to three separate occasions in which she raised the issue of discrimination to Apple: (1) the August 2003 email, (2) the EEOC complaint filed in December 2004, and (3) the present lawsuit filed in May 2004.  (Opp'n at 24:14-18.)  Zayed argues that Apple's adverse action consisted of the negative performance review at her next scheduled review, four months after the August 2003 email; her subsequent demotion in May 2004; and termination in September 2004.  (Opp'n at 24:28-25:3.)  Zayed seeks to establish causation between the protected activity and adverse action with circumstantial evidence, emphasizing that her negative evaluation arose at the first scheduled performance review four months later.  (Opp'n at 25:4-13.)  In responding to Apple's assertions regarding pretext, Zayed argues that proximity in time helps support the existence of pretext.  Further, Zayed argues that Apple cannot substantiate its claims that Zayed lacked technical skill, and that Apple failed to follow its own policies concerning discipline and employee reviews.  (Opp'n at 26:11-15.)

1.      Zayed's August 2003 Email

Apple argues that Zayed's August 2003 email was not a protected activity because it did not mention discrimination.  (Mot. at 21:15-17.)  On the other hand, Zayed contends that "there was no

16

1   question that Black knew [her] complaints had been consistently related to discrimination, and that

2   [she] was seeking a remedy for [her] unfair treatment."  (Zayed Decl. ¶ 28.)  Zayed also stated that

3   with regard to the numerous times she spoke with Black and Mages about her career development

4   and future at Apple:

> When I expressed my concern that I was being treated unfairly regarding assignments
> and promotions, I understood these conversations to be about the disparity between
> my experience as an Egyptian, Arab, Muslim, woman, and the opportunities that were
> being handed out to my male, Caucasian, non-Arab colleagues in no discernable
> pattern.  As a result of these conversations, I felt an increasing hostility directed at me
> because of my race, gender, nationality, and religion.

(Zayed Decl. ¶ 26.)

The Court is not persuaded by Zayed's argument that the August 2003 email could

reasonably be construed as protected activity relating to her allegations of discrimination.  In

examining the email, Zayed refers to her career development, the tangential assignments given to her

compared to her colleagues' opportunities, and overall low job satisfaction.  (Perry Decl., Exhibit I

[August 2003 email].)  The Court recognizes that this email may have contained an implicit

reference to discrimination, but without any specific language complaining of discrimination the

email is nothing more than a complaint about unfair treatment.  The Ninth Circuit has stated that an

employee's statement cannot be opposed to an unlawful employment practice unless it "refers to

*some* practice by the employer that is allegedly unlawful."  EEOC v. Crown Zellerbach Corp., 720

F.2d 1008, 1013 (9th Cir. 1983).  The Third Circuit has also adopted a similar rationale regarding

how specific an employee's opposition must be to support a prima facie case of retaliation.  In

Barber v. CSX Distrib. Serv., 68 F.3d 694, 701-702 (3d Cir. 1995), the Court held that plaintiff's

letter could not constitute the requisite protected conduct for a prima facie case of retaliation when

the letter merely complained about unfair treatment in general, without specifically complaining

about age discrimination, and expressed dissatisfaction with the fact that another employee received

the promotion in question.

To the extent that Apple's motion contests Zayed's claim of retaliation for writing the August

2003 email to Black entitled "Future Direction," the Court grants Apple's summary judgment motion

17

1    because this email cannot reasonably be construed as protected activity.

2        2.      Zayed's December 2003 Email

3        Apple contends it could not have retaliated for the email sent to Black following Zayed's

4    negative performance evaluation because the allegedly adverse action occurred too far after the

5    allegedly protected activity.  (Mot. at 22:22-23:2.)  In the December email, Zayed contested the

6    negative performance evaluation given earlier that month and stated that she believed she "ha[d] not

7    been given [her] warranted and earned position as well as [her] merited raises for ethnic, gender, and

8    age reasons."  (Perry Decl., Exhibit L [December 2003 email].)  Unlike the previous email, the Court

9    finds this email is sufficiently specific to be an opposition to an unlawful employment practice.

10       With regard to adverse action and pretext, Apple makes parallel arguments to those made

11   against the claims for race discrimination.  For the reasons listed above in Section A, the Court finds

12   that there is a triable issue of fact regarding whether Zayed suffered an adverse employment action

13   after the December 2003 email, and whether Apple's legitimate explanations for her treatment are

14   pretext.

15       The Court further finds that the length of time between the December 2003 email and

16   Zayed's reassignment in May 2004 were sufficiently close in time to support her prima facie case of

17   retaliation.  Apple cites many cases outside the Ninth Circuit for the proposition that mere temporal

18   proximity cannot support causation unless the two events are very close in time.  (See Mot. at 23:1-

19   14.)  However, the Ninth Circuit has not adopted a bright line rule regarding how much time will

20   permit an inference of causation.  See Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir. 2003).

21   This Court finds the time between protected activity and the allegedly adverse action are sufficiently

22   close such that a jury may find that Zayed's reassignment and other treatment were in retaliation for

23   her December 2003 email.  Insofar as Apple argues that summary judgment is appropriate regarding

24   retaliation for the December 2003 email, the Court denies Apple's motion.

25       3.      Zayed's Lawsuit

26       Zayed filed the instant lawsuit in May 2004.  Shortly thereafter, she was allegedly subjected

27

28                                                     18

to an adverse employment action: on May 25, 2004, she was reassigned to a specific unit test development position in FCP, which was one grade level lower than her previous position. Ultimately, she was terminated on September 28, 2004. This evidence is sufficient to raise a triable issue of fact.

F.     Failure to Prevent Harassment Claim

Apple contends that Zayed's claim for failure to prevent harassment must fail because she cannot state an underlying claim for either harassment or discrimination. (Mot. at 24:23-25:3.) Apple contends that "[a]n employer that maintains policies and undertakes affirmative programs to prevent discrimination cannot be liable for failure to prevent discrimination under FEHA." (Mot. at 25:5-6.)

While the Court acknowledges that Apple has implemented policies to prevent discrimination and makes no determination as to the reasonableness of these policies, the claim for failure to prevent harassment should not be dismissed on summary judgment because this Court has found the underlying discrimination should proceed. This result is supported by the cases cited by Apple in its motion for the proposition that Apple's reasonable measures to prevent discrimination prohibit a finding of liability for failure to prevent. (See Mot. at 25:4-16.) Apple cited cases in which each court granted summary judgment on the failure to prevent claims when it also dismissed the underlying discrimination or harassment claim. Because there is a triable issue of fact regarding whether Apple discriminated against Zayed, the Court finds a genuine issue of fact exists regarding Apple's alleged failure to prevent.

G.     Defamation

To prevail on a claim of defamation in California, the plaintiff must show an intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. Smith v. Maldonado, 72 Cal. App. 4th 637, 645 (Cal. Ct. App. 1999). Zayed's claims of slander and libel are comprised of two statements in her performance evaluation: one statement describes her as having an adversarial attitude that annoyed and disrupted team

members' work, and the other statement describes her as dishonest.  (Mot. at 26:11-15; Perry Decl., Exhibit J [Performance Evaluation].)  Apple contends the statements are not actionable for four independent reasons.  First, Apple cites to black letter law that "unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior," it cannot be defamation.  Jensen v. Hewlett-Packard Co., 14 Cal. App. 4th 958, 965 (Cal. Ct. App. 1993).  Apple argues that remarks about Zayed's adversarial attitude and being annoying do not meet this standard.  (Mot. at 27:1-2.)  Second, Apple contends that there is no publication beyond Zayed's managers and HR to satisfy the prima facie case.  Third, Apple contends the statements are privileged because they were made in the context of a performance evaluation and are just opinions.  (Mot. at 27:9-10, 27:26-28, & 28:9-10.)  Fourth, Apple contends the statements were true, and that truth is an absolute defense to defamation.  (Mot. at 28:25-29:2.)

Zayed responds by arguing that the statements were defamatory as a matter of law for two reasons: first, statements which call into question plaintiff's integrity are clearly defamatory, and second, the "lack of honesty" statement was a statement of fact.  (Opp'n at 29:9-17.)  Zayed argues that the statements were not mere recitations of someone's feelings and were not preceded by any statement qualifying or limiting the statement as QA's opinion.  (Opp'n at 29:15-19.)  With regard to whether the statements were privileged, Zayed claims that Apple mischaracterizes the number of people to whom the statement was published.  (Opp'n at 30:2-3.)  Zayed points out that oral communications surround personnel reviews and that these reviews are reviewed by other persons in the company.  Zayed also believes that this performance review may have been read or discussed with other departments of Apple, to whom Zayed applied for a position but was denied.  (Opp'n at 30:6-7.)

The Court is persuaded by Apple's arguments that Zayed's defamation claim cannot survive summary judgment.  California courts have strongly disfavored libel suits based on employee communications in employee performance reviews.  See Jensen v. Hewlett-Packard Co., 14 Cal.

20

App. 4th 958, 964 (Cal. Ct. App. 1993) (stating that evaluations serve the important business purpose of documenting the employer's hiring, promotion, discipline and firing practices, and serve as a vehicle for informing the employee of what management expects, how the employee measures up, and what must be done to obtain wage increases, promotions, and other recognition).

The statements in the performance evaluation are clearly opinion and not defamatory as a matter of law.  Furthermore, to the extent that the statements question Zayed's integrity and honesty, the Court finds that the statements were privileged and were made in the course of communications intended to better Zayed and Apple's working relationship.  See Cuenca v. Safeway San Francisco Employees Fed. Credit Union, 180 Cal. App. 3d 985, 996 (stating that "[c]ommunications made in a commercial setting relating to the conduct of an employee have been held to fall squarely within the qualified privilege for communications to interested persons," defined as a recipient with a common interest); see also Chambers v. American Trans Air, Inc., 577 N.E.2d 612, 615 (stating the qualified privilege defense to defamation arises from the "necessity for full and unrestricted communication on matters in which the parties have a common interest or duty").

Further, there is no evidence that Apple published the allegedly defamatory statements.  The only persons who learned of the statements did so in the course of their employment at Apple, and the persons who may not have learned of the statements in the course of performing their duties were informed by Zayed herself.  Zayed does not substantiate her claim that employees in other departments at Apple learned of the statement, and merely concludes that the reason Zayed did not find another job within Apple must have been these allegedly defamatory statements.  The Court also notes that Zayed was able to find another position outside of Apple following her termination; there is no basis to believe that anyone other than the persons Zayed told knew about the evaluation.

For the reasons listed above, the Court grants Apple's motion for summary judgment on the defamation claims.

H.     Intentional Infliction of Emotional Distress

In order to prevail in the claim for intentional infliction of emotional distress ("IIED"), Zayed must prove that the conduct was extreme and outrageous.  Yurick v. Superior Court, 209 Cal. App.

3d 1116, 1123 (Cal. Ct. App. 1989). The conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community. <u>Cervantez v. J.C. Penny Co.</u>, 24 Cal.3d 579, 593 (1979).

Because the Court is permitting the discrimination and a portion of the retaliation claims to proceed, the Court denies summary judgment on the IIED claim as well.

V. CONCLUSION

For the reasons set forth above, Apple's motion for summary judgment is granted in part and denied in part. Specifically, the Court denies Apple's motion for summary judgment on the following claims: discrimination based on race, national origin, religion, and gender; failure to prevent harassment; failure to promote; and IIED. With regard to the retaliation claim, the Court grants summary adjudication that there was no actionable retaliation as a result of Zayed's August 2003 email, but finds that there are genuine issues of fact regarding whether Zayed retaliated after Zayed sent the December 2003 email and after Zayed filed the instant lawsuit. The Court grants summary judgment on the defamation claims for slander and libel. Lastly, Apple's "Motion For Sanctions, And Objecting To Evidence And Moving To Strike Evidence Submitted By Plaintiff Nancy Zayed In Opposition To Defendants' Motion for Summary Judgment" is denied.

Dated: April 4, 2006
04cv1787sj

/s/James Ware
JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Jessica Perry jperry@orrick.com
Joseph Liburt jliburt@orrick.com
Waukeen Q McCoy mccoylawsf@yahoo.com

**Dated: April 5, 2006**                                    **Richard W. Wieking, Clerk**


                                                            **By:___/s/JW Chambers_____**
                                                            **Melissa Peralta**
                                                            **Courtroom Deputy**

United States District Court

For the Northern District of California